**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LARRY HUETTEMAN, derivatively, on behalf of ABBOTT LABORATORIES INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT B. FORD, ROBERT E. FUNCK, JR., JOSEPH MANNING, ROBERT J. ALPERN, M.D., ROXANNE S. AUSTIN, SALLY E. BLOUNT, PH.D., PAOLA GONZALEZ, MICHELLE A. KUMBIER, DARREN W. MCDEW, NANCY MCKINSTRY, WILLIAM A. OSBORN, MICHAEL F. ROMAN, DANIEL STARKS, JOHN G. STRATTON, GLENN F. TILTON, CHRISTOPHER CALAMARI, ANDREA WAINER, DANIEL SALVADORI, ANDREW LANE, LOUIS MORRONE, ROGER BIRD, JARED WATKIN, WILLIAM WOODGRIFT, MICHAEL DALE, SAMMY KARAM, MICHAEL PEDERSON, GREGORY AHLBERG, JOHN CAPEK, PHILIP BOUDREAU, HUBERT L. ALLEN, and CHRISTOPER SCROGGINS <br><br> Defendants, <br><br> ABBOTT LABORATORIES, <br><br> Nominal Defendant. | Case no. 1:23-cv-296 |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

By and through his undersigned counsel, Plaintiff Larry Huetteman ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Abbott Laboratories Corporation ("Abbott" or the "Company") and against certain officers and directors of the Company for breaches of their fiduciary duties as directors and/or officers of Abbott, under the

1

Illinois Business Corporation Act ("IBCA"), 805 ILCS 5 (1983), insider trading, and for violations of Section 10b and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, analysts conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Abbott, legal filings in various regulatory proceedings against Abbott, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and review and analysis of court filings in the related securities class action lawsuit alleging violations of federal securities law based on similar facts and circumstances alleged herein, styled *Pembroke Pines Firefighters & Police Officers Pension Fund v. Abbott Laboratories, et al.*, Case No. 1:22-cv-4661 (the "Securities Class Action"), currently pending in the United States District Court for the Northern District of Illinois. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Abbott's directors and officers from February 1, 2021 through June 8, 2022 (the "Relevant Period").

2.      Abbott is an Illinois Corporation and Illinois based multinational medical devices and health care company, selling medical devices, diagnostics, branded generic medicines and nutritional products and generating revenues of $109 billion between 2019 and 2021.

3.      The Company's flagship products include infant nutritional product manufactured at its facility in Sturgis, Michigan with common household names like Pedialyte, Similac, and Ensure.

4.      Abbott's primary manufacturing site for baby formula was located in Sturgis, Michigan ("Sturgis").  Prior to February 2022, Abbott had produced 40% of the United States' baby formula and 40% of that amount was produced in Abbott's Sturgis plant which manufactured infant formula feeding roughly one in six formula-fed babies in the United States.

5.      This action describes Abbott's two decade long history of violations of FDA regulations resulting in fines, consent decrees and other settlements with government agencies. Despite repeated violations of compliance rules mandated by the Food and Drug Administration ("FDA"), Abbott's directors failed, or refused, to implement, maintain and oversee any system of reporting and controls that included the Sturgis facility despite repeated red flags. Abbott's latest compliance failures allowed management's scheme to maximize revenues at Sturgis, a major provider of infant formula to the nation and a material source of revenue for Abbott from government rebates for infant formula. Inflated infant formula revenues and concealment of material adverse non-public information inflated Company's stock price. The Defendant Directors ignored lapses in infant formula manufacturing safety protocols that ultimately were linked to serious infant illnesses and even deaths and concealed those risks in publicly filed SEC filings which were signed by the Director Defendants. When the previously concealed facts were revealed to the investing public, the market value of Abbott common stock declined.

6.     Throughout the Relevant Period and prior thereto, the Director Defendants, a majority of whom were directors during Abbott's prior regulatory violation proceedings and settlements, violated their fiduciary duties to ensure that Abbott had proper reporting systems and adequate internal controls to detect and allow the Board to monitor the type of regulatory non-compliance by Abbott which led to the recall of its baby formula products and a protracted shutdown of the Sturgis facility in February 2022.[1]

7.     Throughout the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements and omissions of material fact regarding the compliance with FDA regulations regarding the safety and sanitation of Abbott's Sturgis facility, widespread baby formula manufacturing deficiencies, the actual risk of regulatory action, product recalls and plant shutdown presented by the conditions brought to Abbott's executive officer and directors' attention as early as February 2021.

8.     Throughout the Relevant Period, due to the fact that the Director Defendants did not create any operative information and control systems, Abbott management could operate Sturgis to maximize production and profits at the expense of compliance. The Director Defendants allowed Abbott to violate a prior agreement and consent decrees with the Department of Justice.

9.     The Defendants knew or should have known of a credible whistleblower complaint provided to Abbott on or about February 19, 2021 but filed earlier. The whistleblower had made a previous attempt to alert Abbott executives of regulatory violations. By at least September 20, 2021, Abbott received complaints of infant deaths, conditions and practices at Sturgis that were linked to Abbott's baby formula. Also on September 20, 2021, the United

---

[1] *See* https://www.supplychaindive.com/news/timeline-infant-formula-shortage/624570/ (last visited January 13, 2023)

States Food and Drug Administration ("FDA") began a four-day inspection of the Sturgis facility attended by nearly a dozen investigators and issued to Abbott a "483" Report which reported the facility "did not maintain a building used in the manufacturing, processing, packing or holding of infant formula in a clean and sanitary condition." The 483 report was ignored because when inspectors returned in January 2022, the same violations were noted.

10. The FDA returned in January 2022 for follow-up inspections.

11. On February 17, 2022, the FDA publicly announced that it was investigating four consumer complaints of infant illness related to powdered infant formula produced by Abbott in Sturgis. The FDA stated that it had initiated an onsite inspection at the facility, and to date had found several positive contamination results from environmental samples for a bacteria, Cronobacter sakazakii ("Cronobacter"), linked to infant illnesses and death. The FDA also revealed that its review of Abbott's internal records indicated "environmental contamination with Cronobacter and the firm's destruction of product due to the presence of Cronobacter."

12. On the same day, Abbott issued a recall of certain baby formula products, including the popular brands Similac, Alimentum and EleCare, all manufactured in Sturgis. Abbott made no mention of the open FDA investigation. In the press release, Defendant Manning, characterized Abbott's "voluntary" recall as "proactive," stating: "We know parents depend on us to provide them with the highest quality nutrition formulas. We're taking this action so parents know they can trust us to meet our high standards, as well as theirs."

13. In the following days, Abbott was forced to close the Sturgis plant due to the severe safety problems, shuttering one of the major sources of baby formula for the entire United States, as well as certain Canadian and foreign markets. A nationwide shortage of baby formula ensued. Without the Sturgis facility, the U.S. government was forced to take the unprecedented

step of invoking the Defense Production Act to expedite production of infant formula and authorize flights to import supply from overseas to keep the country's most at risk population fed and healthy.

14. After the whistleblower complaint was provided to the FDA and OSHA, the FDA began an investigation including interviewing the whistleblower and gathering corroboration. A redacted copy of the FDA's report of the whistleblower complaint was publicly disclosed in April 2022 (the "Report"). That Report contained damning conclusions implicating Abbott's directors' dereliction of duties to ensure the creation, maintenance and functioning of information and control systems: "Even though the acquisition [of Sturgis by Abbott] took place many years ago, the Strugis site has never been fully integrated with Abbott's system and internal controls." The Report alleged that Abbott's management was aware of the issues at the Sturgis facility well before the FDA 483 inspection. The Report stated that the whistleblower complaint alleged that Abbott management falsified test records and released untested infant formula to the market, and attempted to mislead the FDA during a 2019 inspection audit.

15. The FDA report concluded:

> Abbott's inaction is also inconsistent with the Corporate Integrity Agreement that it entered into with the Office of Inspector General of the Department of Health and Human Services in May of 2012 as part of a plea agreement. *United States v. Abbott Laboratories*, No. 12-cr-00026 (W.D. Va., filed May 7, 2012) [sometimes hereinafter referred to as the "CIA"]. At the same time, Abbott also entered into settlement agreements with various states. Thought not directly applicable to Abbott Nutrition, the core concepts apply in terms of the ongoing obligations on the part of Abbott's management and board of directors. [Emphasis supplied]

16.     In addition, the Report stated complaint alleged that the Company used testing procedures that management knew were deficient and that Abbott was unable to adequately trace products subject to recall.  The Report stated, *inter alia*:[2]

> Most often, Complainant directed his concerns as to a lack of accountability to his supervisor. But other members of management were involved, including officials at the division level. His concerns were summarily dismissed as "petty." This extended to situations where unaddressed PIRs were intentionally placed in batch files after the release of a batch, thereby suggesting a regulatory violation.

> At the Sturgis site, discipline is not applied consistently. Favored employees are not disciplined in the same manner as those viewed as being outspoken as to compliance issues. Enforcement is selective and inconsistent thereby signaling retaliation to those who raise concerns.

> More serious is the fact that members of management who are intimately involved with circumventing what exist in terms of internal controls are not subject to any discipline other than for failures to meet their metrics. These are individuals who also repeatedly misled officials at the division and corporate level. These are individuals who knowingly direct and approve of actions in direct violation of FDA regulations. A culture of compliance does not exist at the Sturgis site as mandated by the FDA and the Department of Justice's guidance.

17.     In June 2022, at Congressional hearings, House Appropriations Chair Rosa DeLauro, who had publicly lambasted both Abbott and the FDA for the infant formula debacle in recent months, praised the former employee for coming forward with new details about conditions in the plant and questionable management and in an implicit endorsement of the whistleblower's claims' veracity stated:

> Their revelations highlight Abbott's investment in profit over people — as the company time and time again seemed more interested in cornering its share of the market instead of ensuring the product we give to our babies meets the highest food safety standards," DeLauro said in a statement to POLITICO.[3]

---

[2] See https://www.marlerblog.com/files/2022/04/Redacted-Confidential-Disclosure-re-Abbott-Laboratories-10-19-2021_Redacted-1-1.pdf (last visited October 25, 2022)
[3] *See* https://www.politico.com/news/2022/08/04/baby-formula-plant-flaws-hidden-00049721

18.     Knowing that the whistleblower complaint and attendant regulatory attention and inevitable 483 inspections could lead to the closure of the Sturgis facility, the largest baby formula manufacturing facility in the U.S., and before disclosing it to the public, certain Abbott insiders (referred to collectively as the Insider Trading Defendants) sold approximately $130 million worth of Abbott stock during the Relevant Period. These insiders had direct and unfettered access to information about Sturgis violations and the incident and safety reports concerning Sturgis, its shutdown, product recalls and federal law violations.

19.     The Director Defendants violated their fiduciary duties and committed violations of Section 10b-5 of the Securities Exchange Act of 1934 in an additional way by causing Abbott to repurchase hundreds of millions of dollars of its own stock in the open market in the last quarter of 2021 and first quarter of 2022 at artificially inflated prices.

20.     Through this action, Plaintiff seeks to recover for Abbott its damages caused by the Individual Defendants' various breaches of fiduciary duties and violations of the federal securities laws pled herein as well as disgorgement of insider trading profits. The Individual Defendants owed and owe the highest fiduciary duties to Abbott and its stockholders. They were aware of the violations of law occurring at a manufacturing facility that was of material importance to the Company and its business prospects, as well as to the safety of consumers who use the Company's products. If the Director Defendants were not aware of events and conductions at Sturgis since 2019 it was due to their failure to implement and maintain adequate reporting and control systems and to oversee Abbott's and indeed the Board's own compliance with prior government orders, decrees and settlements. Likewise, the Individual Defendants were aware of the requirement to provide truthful, accurate, and complete information pursuant to the federal securities laws in SEC filings during the Relevant Period.

21.     Under the circumstances, demand upon the current board of directors would be futile.

## II.     JURISDICTION AND VENUE

22.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for, *inter alia*, violations of sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a) diversity jurisdiction.

24.     This Court has jurisdiction over each defendant named herein because each is either a corporation that conducts business in and maintains operations in this District, is an individual residing in this District, and/or is an individual non-resident who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Abbott maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### III.    PARTIES

26.    Plaintiff is a current stockholder of Abbott, was a stockholder of Abbott at the time of the wrongdoing alleged herein, and continuously held Abbott stock at all relevant times.

#### A.    Nominal Defendant

27.    Nominal Defendant, Abbott is an Illinois corporation with principal executive offices located in this District.

#### B.    Current Director Defendants

28.    The Current Director Defendants constitute of 12 of Abbott's current 13-member board.

29.    Robert B. Ford ("Ford") is Abbott's Chairman of the Board and Chief Executive Officer. He has been a director since 2019 and assumed the role of Chairman in December 2021, having been appointed President and Chief Executive Officer in March 2020.  From 2018 to 2020, he was Abbott's President and Chief Operating Officer. He is currently a member and the chair of the Executive Committee and was a member and the chair of the Executive Committee during the Relevant Period.

30.    Robert J. Alpern ("Alpern") has been a director since 2008.  He is currently a member of the Public Policy Committee and the Nominations and Governance Committee and was a member of the Public Policy Committee and the Nominations and Governance Committee during the Relevant Period. He also sits on the Boards of Abbvie, Inc. and Tricida, Inc.

31.    Sally E. Blount, PH.D. ("Blount") has been a director since 2011.  She is currently a member of the Public Policy Committee and the Nominations and Governance Committee and was a member of the Public Policy Committee and the Nominations and Governance Committee during the Relevant Period. Ms. Blount's full-time employment appears

to be as President and Chief Executive Officer, Catholic Charities of the Archdiocese of Chicago and Professor at Northwestern University.

32.    Paola Gonzalez ("Gonzalez") has been a director since 2021.  She is currently a member of the Audit Committee and was a member of the Audit Committee during the Relevant Period. Gonzalez's full-time job is as Vice President and Treasurer of Clorox Company.

33.    Michelle A. Kumbier ("Kumbier") has been a director since 2018.  She is currently a member of the Audit and Compensation Committee and was a member of Audit and Compensation Committee during the Relevant Period. Kumbier's full-time job is President of Briggs & Stratton LLC. She is also a director of Tennecco, Inc. and Teledyne Technologies Inc.

34.    Darren W. McDew ("McDew") has been a director since 2019.  He is currently a member of the Nominations and Public Policy Committee and was a member of the Nominations and Public Policy Committee during the Relevant Period. McDew also serves on the Board of Rolls Royce, Inc; United Services Automobile Association and Boys & Girls Club of America.

35.    Nancy McKinstry ("McKinstry") has been a director since 2011. She is currently a member and chair of the Audit Committee and a member of the Compensation and Executive Committee and was a member and chair of the Audit Committee and a member of the Compensation and Executive Committee during the Relevant Period. McKinstry's full time job is CEO and Chairman at Walter Klumers, N.V., she is also on the Board of Accenture, plc.

36.    William A. Osborn ("Osborn") has been a director since 2008.  He is currently a member and chair of the Nominations and Governance Committee and a member of the Compensation and Executive Committees and was a member and chair of the Nominations and Governance Committee and a member of the Compensation and Executive Committees during the Relevant Period.

11

37.     Michael F. Roman ("Roman") has been a director since 2021. He is currently a member of the Nominations and Governance Committee and a member of the Compensation and Executive Committees and was a member and chair of the Nominations and Governance Committee and a member of the Compensation and Executive Committees during the Relevant Period. Roman's full-time job is Chief President and CEO of 3M Company.

38.     Daniel Starks ("Starks") has been a director since 2017.  He is currently a member of the Public Policy Committee and was a member and of the Public Policy Committee a during the Relevant Period.

39.     John G. Stratton ("Stratton") has been a director since 2017. He is currently a member of the Audit and Public Policy Committees and was a member of the Audit and Public Policy Committees a during the Relevant Period. Stratton is Executive Chairman at Frontier Communications Parent Inc. and a board member at General Dynamics Corporation.

40.     Glenn F. Tilton ("Tilton") has been a director since 2007.  He is currently a member of the Audit, Public Policy and Executive Committees and was a member of the Audit and Public Policy Committees a during the Relevant Period. Triton also serves on the Boards of AbbeVie, Inc. and Philips 66.

**C.      Former Directors**

41.     Miles D. White ("White") was a director from 1998 to December 2021.  He is the former CEO, and former chair of the Executive Committee and the Executive Chairman during the Relevant Period.

42.     Roxanne S. Austin ("Austin") was a director from 2000 to April 2022.

### D. **Officers**

43.     Defendant Robert E. Funck, Jr. ("Funck") is Abbott's Chief Financial Officer and Vice President, Finance. Funck assumed this role in March 2020. Prior to his appointment as Chief Financial Officer, Funck served as Senior Vice President, Finance and Controller at Abbott.

### E. **Vice Presidents**

44.     The Vice President Defendants all sold Abbott Labs stock during the Relevant Period while in possession of material non-public information.

45.     Christopher Calamari ("Calamari") is Abbott's Senior Vice President, U.S. Nutrition. He was appointed to this role in July 2021. Prior to assuming this role, Calamari served as Vice President, Pediatric Nutrition. Calamari joined Abbott in 2005 and has held marketing positions in the company's Nutrition and Pharmaceuticals businesses.

46.     Andrea Wainer ("Wainer") is Abbott's Executive Vice President, Rapid and Molecular Diagnostics. She was appointed to this role in June 2019.

47.     Daniel Salvadori ("Salvadori") is Abbott's Executive Vice President and Group President, Established Pharmaceuticals and Nutritional Products. He was appointed to this role in December 2021.

48.     Andrew Lane ("Lane") has been Executive Vice President, Established Pharmaceuticals of Abbott Laboratories since 2017.

49.     Louis Morrone ("Morrone") is Abbott's Senior Vice President, Rapid Diagnostics. He was appointed to this role in July 2021. Prior to assuming his current role, he served as Vice President, Transfusion Medicine.

13

50. Roger Bird ("Bird") is Abbott's Senior Vice President, U.S. Nutrition. He was appointed to this role in February 2015.

51. Jared Watkin ("Watkin') is Abbott's Senior Vice President, Diabetes Care. Prior to assuming this role in June 2015, he served as Divisional Vice President, Technical Operations. Watkin joined Abbott in 1996, when Abbott acquired Medisense, Inc.

52. Randell William Woodgrift ("Woodgrift") is Abbott's Senior Vice President, Cardiac Rhythm Management. He was appointed to this role in 2019. He previously served as Vice President, Global Operations, Cardiovascular and Neuromodulation.

53. Michael Dale ("Dale") is Senior Vice President, Structural Heart Division. He was appointed to this role in November 2019.

54. Sammy Karam ("Karam") is a Senior Vice President, Emerging Markets in Abbott's branded medicines business. Prior to assuming this position in February 2019, he served as Divisional Vice President, Global Marketing and Commercial Execution.

55. Michael Pederson ("Pederson") is Abbott's Senior Vice President, Electrophysiology. He was appointed to this role in April 2020.

56. Greg Ahlberg ("Ahlberg") is Senior Vice President, Core Laboratory Diagnostics, Commercial Operations. He was appointed to this role in October 2020.

57. Louis Morrone ("Morrone") is Abbott's Senior Vice President, Rapid Diagnostics. He was appointed to this role in July 2021. Prior to assuming his current role, he served as Vice President, Transfusion Medicine.

58. John Capek ("Capek") is Executive Vice President, Ventures. Dr. Capek was appointed to this role in June 2015. In this role, he leads Abbott's venture investment organization as well as new ventures, including Abbott Electrophysiology. Previously, he had

14

served as Executive Vice President, Medical Devices, and Senior Vice President, Abbott

Vascular.

59.     Defendant Joseph Manning ("Manning") is Manning assumed this role in

December 2021.

60.     Defendant Philip Boudreau ("Boudreau") is Abbott's Executive Vice President

and Corporate Controller.

61.     Defendant Hubert L. Allen ("Allen") is and has served as Abbott's Executive

Vice President, General Counsel and Secretary since 2013.

62.     Defendant Christopher Scoggins ("Scoggins") is or was Abbott's Executive Vice

President, General Counsel and Secretary since 2013.

## IV.     ABBOTT'S CORPORATE GOVERANCE

### A.     Abbott's Code Of Business Conduct For Directors

63.     Abbott's Code of Business Conduct for directors states in pertinent part:

**XII.  Code of Business Conduct**

Directors shall adhere to the principles of Abbott's Code of
Business Conduct as it applies to Directors.  Those obligations of
the directors are described below.

**COMPLIANCE WITH LAWS**

Directors shall comply with all laws, rules, and regulations
applicable to their capacity as directors of Abbott, including,
among others, the insider trading laws, rules and regulations.

**REPORTING OF ANY ILLEGAL OR UNETHICAL
BEHAVIOR**

Directors shall report violations of laws, rules, regulations of the
Code of Business Conduct to the Chairman of the Board, the Chief
Executive Officer, the Vice President and Compliance Officer, or
any other appropriate Abbott personnel.

15

### B. Abbott's Code Of Business Conduct For Abbott Officers, Employees, Contract Workers And Agents

64.     Abbott's Code of Business Conduct for officers, employees, contract workers and

agents contains an introductory message by Defendant Ford, which states:

> We create life-changing health technologies that help people live better, fuller lives. It's a privilege to do this work- and we need to do it in a way that lives up to the nobility of our purpose, with the highest and most ethical of business practices.
>
> * * *
>
> The fundamental message of the Code is clear: it's up to us, as the people of Abbott, to hold ourselves to the highest standards, to live up to our best ideals, and to operate our business with the utmost integrity at all times. Our Code is here to help us do so and to protect our most valuable asset as an organization - our reputation

65.     With respect to Product Quality, The Code of Business Conduct states:

> **We produce and deliver safe, effective products that people trust.**
>
> We endeavor to maintain the highest level of quality throughout our business. This effort starts with the sourcing of materials and the manufacture of our products and moves through how we market, sell, and supply our products, including through our business partners - delivering high quality is imperative every step of the way. Our commitment to the health and safety of the people who use our products is always at the forefront of everything we do.
>
> * * *
>
> Q What do I do if someone tells me about a product quality issue?
>
> A If we become aware of an unfavorable user result that occurred while using an Abbott product, we must report it to the appropriate individuals or groups within Abbott. We must report adverse events with any of our products in the timeframe required by our division procedures, even if we are not sure there is a cause-and-effect relationship between the product and the "event."

66.     With respect to the Company's compliance with applicable laws and regulations,

the Code of Business Conduct provides:

> **We adhere to all laws, regulations and Abbott requirements that apply to our work.**

16

Every Abbott employee is expected to adhere to all laws and Abbott's policies, procedures, principles and standards, including this Code. This is a fundamental expectation and condition of employment. Abbott's policies and procedures cover topics related to important aspects of our operations, including health care compliance, quality, engineering, customs and trade, finance, security, purchasing, human resources, and information systems, to help ensure that we comply with the many laws and regulations governing our business. Such policies and procedures enable us to detect, correct and prevent non-compliant activities.

67.     The Individual Defendants violated the Code of Business Conduct by failing to proactively monitor, test, upgrade and modernize the Sturgis facility, hiding the contamination issues at the Sturgis, and the Company's inability to accurately identify contaminated infant formula products for recall. The Individual Defendants also violated the Code of Business Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and/or to fail to correct false and misleading statements regarding or concerning Abbott, and by disguising his violations of law, including breaches of fiduciary duty, insider trading, and the aiding and abetting thereof by the Individual Defendants, and failing to report the same.

### C.    **Abbott's Board Committees**

68.     Abbott's has five standing committees of its Board of Directors: Audit Committee; Compensation Committee; Executive Committee; the Nominations And Governance Committee and Public Policy Committee. Both the Audit Committee and the Public Policy Committee are responsible for compliance and risk management.

69.     In 2021, Abbott's Audit Committee consisted of Defendants McKinstry (CH), Gonzalez, Kumbier, Roman, Stratton and Tilton; Abbott's Public Policy Committee consisted of Defendants Tilton (Ch); Alpern; Babineaux Fontenot (non-defendant); Blount; McDew; Starks and Stratton. Defendants Tilton and Stratton sit on both committees. The Director Defendants who were on those committees in 2021 constitute a majority of the current board.

17

## V.     BACKGROUND

### A.     Abbott Labs' Nutritional Product Business Is Material To Its Operations

70.     Abbott is an Illinois corporation, incorporated in 1900.  Abbott's principal business is the discovery, development, manufacture, and sale of a broad and diversified line of health care products.

71.     In its 2021 10-K, Abbott describes its operations, in part as follows:

> Abbott has four reportable segments: Established Pharmaceutical Products, Diagnostic Products, Nutritional Products, and Medical Devices.
>
> **Nutritional Products**
>
> These products include a broad line of pediatric and adult nutritional products manufactured, marketed, and sold worldwide. These products are generally marketed and sold directly to consumers and to institutions, wholesalers, retailers, health care facilities, government agencies, and third-party distributors from Abbott-owned distribution centers or third-party distributors.
>
> The principal products included in the Nutritional Products segment are:

- various forms of infant formula and follow-on formula, including Similac®, Similac® 360 Total Care®, Similac Pro-Advance®, Similac® Advance®, Similac® Advance® Non-GMO, Similac Pro-Sensitive®, Similac Sensitive®, Similac Sensitive® Non-GMO, Go&Grow by Similac®, Similac® NeoSure®, Similac® Organic, Similac® Special Care®, Similac Total Comfort®, Similac For Supplementation, Isomil® Advance®, Isomil®, Alimentum®, Gain™, Grow™, Similac En Mei Li™, and Eleva™;

- adult and other pediatric nutritional products, including Ensure®, Ensure Plus®, Ensure® Enlive®, Ensure® (with NutriVigor®), Ensure® Max Protein, Ensure® High Protein, Glucerna®, Glucerna Hunger Smart®, ProSure™, PediaSure®, PediaSure SideKicks®, PediaSure® Peptide, EleCare®, Juven®, Abound™, Pedialyte® and Zone Perfect®; and

- nutritional products used in enteral feeding in health care institutions, including Jevity®, Glucerna® 1.2 Cal, Glucerna® 1.5 Cal, Osmolite®, Oxepa®, Freego™ (Enteral Pump) and Freego™ sets, Nepro®, and Vital®.

> Primary marketing efforts for nutritional products are directed toward consumers or to securing the recommendation of Abbott's brand of products by physicians or other health care professionals. In addition, nutritional products are also promoted directly to the public by consumer marketing efforts in markets where permitted. Competition for nutritional products in the segment is generally from other diversified consumer and health care manufacturers. Competitive factors include

18

consumer advertising, formulation, packaging, scientific innovation, price, retail distribution, and availability of product forms. A significant aspect of competition is the search for ingredient innovations. The introduction of new products by competitors, changes in medical practices and procedures, and regulatory changes can result in product obsolescence. In addition, private label and local manufacturers' products may increase competitive pressure.

72.     Abbott maintains 14 manufacturing facilities for its nutrition products globally.

73.     Nutritional products were a major portion of Abbott revenues and earnings:

| | | | | | |
|---|---|---|---|---|---|
| U.S. Pediatric Nutritionals | 2,192 | 1,987 | 10 | — | 10 |
| International Adult Nutritionals | 2,632 | 2,228 | 18 | 1 | 17 |
| U.S. Adult Nutritionals | 1,364 | 1,292 | 6 | — | 6 |
| Diagnostics — | | | | | |
| Core Laboratory | 5,128 | 4,475 | 15 | 3 | 12 |
| Molecular | 1,427 | 1,438 | (1) | 2 | (3) |
| Point of Care | 536 | 516 | 4 | 1 | 3 |
| Rapid Diagnostics | 8,553 | 4,376 | 95 | 2 | 93 |
| Medical Devices — | | | | | |
| Rhythm Management | 2,198 | 1,914 | 15 | 2 | 13 |
| Electrophysiology | 1,907 | 1,578 | 21 | 2 | 19 |
| Heart Failure | 889 | 740 | 20 | 1 | 19 |
| Vascular | 2,654 | 2,339 | 14 | 3 | 11 |
| Structural Heart | 1,610 | 1,247 | 29 | 2 | 27 |
| Neuromodulation | 781 | 702 | 11 | 1 | 10 |
| Diabetes Care | 4,328 | 3,267 | 33 | 4 | 29 |

## B.     The Infant Formula Business Is Highly Regulated

74.     Abbott is reportedly a major participant in the Special Supplemental Nutritional Program for Women Infants and Children ("WIC Program") which provides rebates to manufacturers who supply infant formula and otherwise eligible. The benefits of the program to Abbott are conditioned upon compliance with, *inter alia*, provisions of the Food Drug and Cosmetic Act (21 U.S.C. 321) applicable to the production of infant formula at the Sturgis Plant.

75.     Paramount to Abbott's manufacturing is its facility in Sturgis. The Sturgis facility singlehandedly accounted for nearly half of its infant formula where Abbott manufactures,

processes, packs, labels, holds and distributes infant formulas that are marketed under several brand names throughout the United States.

76.     Infant formula is a highly regulated food product that must be made in compliance with the FDA's current good manufacturing practice ("CGMP") requirements established by FDA regulation. These regulations are designed to ensure the safety of infant formula, and they require manufacturers to implement a system of controls to cover all stages of manufacturing, including specific controls to prevent adulteration of infant formula from microorganisms and bacteria.

77.     The FDA has also implemented requirements for record-keeping, including a requirement that manufacturers have procedures for handling all written and oral complaints.

78.     Under these "Infant Formula Record Requirements," manufactures must conduct an investigation when a complaint shows a possible health hazard, and the failure to conduct such an investigation renders infant formula produced under those conditions "adulterated" under the terms of the controlling statute.

**C.      Abbott's Board Ignores Reports Of Compliance Failures At Sturgis**

79.     On or about February 16, 2021, OSHA received a whistleblower complaint detailing unsafe manufacturing practices at Sturgis, and according to published reports sent a copy three days later to the FDA and Abbott.

80.     Abbott has a history of FDA violations of Abbott's manufacturing operations:

(a)     In 1999, Abbott and the FDA entered into a consent decree "to ensure [Abbott's] diagnostic manufacturing processes in Lake County Illinois conform with FDA's current Quality Systems Regulation" Abbott Form 8-K date November 2, 1999. Among other directives in the decree, Abbott agreed to pay $100,000,000. That payment constituted approximately 18 of Abbott's net earnings that quarter (ended September 30, 1999). The consent decree and payment was the subject of a shareholder derivative action: *In Re Abbott Laboratories*, U.S.D.C. N.D. Ill. (99 C 7246). The Seventh

20

Circuit Court of Appeals held that given the circumstances, a shareholder demand futility.

(b)    In 1996 Abbott entered into a consent order with the Federal Trade Commission which had alleged in a complaint that Abbott had misrepresented the results of a survey of doctors as to recommendations of Abbott's Ensure, an adult nutrition supplement and the nutritional value of Ensure. The Consent Order would automatically terminate after 20 years, or 2016 <u>if</u> there were <u>no</u> violations of the FTC consent decree.

(c)    In 2010, the Sturgis site a beetle infestation which led to recalls and shut down of the Plant. Report at 20, n. 57.

(d)(1)    In May 2012, Abbott entered into a Corporate Litigation Agreement ("CIA") with the office of Inspector General of the Department of Health and Human Services as part of a plea agreement. *See e.g., U.S. v. Abbott Laboratories*, No. 12-cv-00026 (W.D. Va.) alleging that Abbott misbranded and falsely marketed its Depakote product. The CIA required Abbott to pay $500,000,000 fine and forfeit $198,000,000 in profits. Abbott was put on a five year probation period through October 2017.

(d)(2)    A condition of the CIA and plea agreement was an annual review of the effectiveness of Abbott's "Compliance Program" as it relates to the marketing, promotion, and sale of pharmaceutical products by Abbott's Board.

(d)(3)    Furthermore, Abbott was required to submit a quarterly report to the probation officer of any "Reportable Events" that occurred during any prior quarters(s).

(d)(4)    A "reportable event" to be reported was <u>not</u> limited to Abbott's Pharmaceutical products but was companywide and worldwide.

(d)(5)    The probation terms defined "Reportable Event" as any matter that a reasonable person would consider a probable violation of Food Drug and Cosmetic Act FDCA 21 U.S.C. 331(a) or (c) related to the misbranding of a pharmaceutical product within the meaning of 21 U.S.C. 352.

81.    By no later than February 19, 2021, it was clear to Defendants that Abbott's Sturgis facility was operating in an unsafe manner and in violation of numerous regulatory requirements relative to the manufacture of infant formula and related products. It was also clear to Defendants that these violations not only posed the threat of Abbott's rebates under the WIC

program and regulatory enforcement and fines, but also presented grave risks to the health and safety of the infants whose parents relied on Abbott's infant formula for their child's most essential nutritional needs. When presented with these dire safety concerns, Defendants did nothing to correct them.

82.     The Director Defendants' failures and omission were due in part to a lack of execution of their duties but also due to the lack of information and control systems. The FDA report of the whistleblower investigation noted: "The ongoing reliance on paper records is suggestive of inadequate corporate controls." *Id*. at 28.

83.     Only after infant deaths connected to Abbott's baby formula were reported to the FDA, and after the FDA finally acted on the detailed accounts of a former Abbott employee, was Abbott forced to recall its infant formula, cease all production at the Sturgis facility, and enter into an onerous consent decree with the United States Department of Justice and FDA.

84.     The OSHA Whistleblower Report in February 2021 was corroborated by another similar whistleblower complaint in October 2021.

## VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS

85.     Throughout the Relevant Period, the Individual Defendants made and/or failed to correct numerous materially false and misleading statements and/or material omissions that concealed the "egregiously unsanitary" conditions at the Sturgis facility, the extent to which those issues were kept from regulators and the public, and the impact of those issues on Abbott's business.

86.     Defendants Ford, Alpern, Blunt, Austin, Gonzalez, Kumbier, McDew, Osborn, McKinstry, Roman, Starks, Stratton and Tilton signed Abbott's materially false and misleading Annual Report on Form 10-K for the Annual Periods ended December 31, 2020 and December

31, 2021 ("2021 10-K") issued on February 18, 2022 but which failed to make any disclosure of Abbott's problems at its Sturgis plant. Similarly, these Defendants caused Abbott's March 18, 2022 Proxy to conceal information about the problems and conditions and investigations at Sturgis.

**The 2020 10-K**

87. On February 19, 2021, Abbott filed its annual report for the year ended December 31, 2020, with the SEC on Form 10-K (the "2020 Annual Report"). The 2020 Annual Report was signed by Defendants Ford and Funck.

88. In that Annual Report, Abbott stated that Total Nutritional Products sales (which includes infant formula manufactured at Sturgis) increased 4.7% in 2020, and its U.S. Pediatric Nutritional business sales (also including the formula produced at Sturgis) increased 5.8% in 2020. In the 2020 Annual Report, Abbott acknowledged:

> **Abbott is subject to numerous governmental regulations and it can be costly to comply with these regulations and to develop compliant products and processes.**
>
> Abbott's products are subject to rigorous regulation by the FDA and numerous international, supranational, federal, and state authorities. The process of obtaining regulatory approvals to market a drug, medical device, or diagnostic product can be costly and time-consuming, and approvals might not be granted for future products, or additional indications or uses of existing products, on a timely basis, if at all. Delays in the receipt of, or failure to obtain, approvals for future products, or new indications and uses, could result in delayed realization of product revenues, reduction in revenues, and substantial additional costs.
>
> In addition, no assurance can be given that Abbott will remain in compliance with applicable FDA and other regulatory requirements once approval or marketing authorization has been obtained for a product. These requirements include, among other things, regulations regarding manufacturing practices, product labeling, and advertising and post marketing reporting, including adverse event reports and field alerts. Many of Abbott's facilities and procedures and those of Abbott's suppliers are subject to ongoing regulation, including periodic inspection by the FDA and other regulatory authorities. Abbott must incur expense and spend time and effort to ensure compliance with these complex regulations. Possible

regulatory actions for non-compliance could include warning letters, fines, damages, injunctions, civil penalties, recalls, seizures of Abbott's products, and criminal prosecution.

89.     On April 20, 2021, the Company held its first-quarter 2021 earnings conference call. During the call, Defendant Ford stated: "In the US and several international markets, we continue to capture share with our leading portfolio of infant formula and toddler brands."

90.     On July 16, 2021, Abbott issued its 2020 ESG Global Sustainability Report to shareholders.  That report stated, *inter alia,* that "Abbott's nutrition business ensures food safety through a tightly controlled manufacturing process that encompasses all steps from accepting materials from suppliers through to final product distribution. We monitor and verify microbiology, packaging integrity, and nutrient and lot control. We complete extensive finished product testing before releasing it for commercial distribution." Abbott's 2020 ESG Global Sustainability Report also touted the Company's Code of Business Conduct and strict compliance procedures that enabled employees to "report any concerns" because "Abbott does not tolerate illegal or unethical behavior in any aspect of our business and that employees are required to ask questions and/or report any concerns."

91.     On July 22, 2021, the Company held its second-quarter 2021 earnings conference call in which Defendants Ford and Funck participated. During the call, Ford stated: "In Pediatric Nutrition, sales grew nearly 4.5% in the quarter, led by growth of nearly 9% in the US, where we continue to capture share with our leading portfolio of infant formula and toddler brands.

92.     On October 20, 2021, the Company held its third-quarter 2021 earnings conference call. During the call, Ford stated:

> I'll now summarize our third quarter results ... I'll start with Nutrition where sales increased 9% compared to last year. Strong growth in the quarter was led by US Pediatric and International Adult Nutrition. In Pediatric Nutrition, sales grew over

24

8.5% in the quarter, led by strong growth in the US from continued share gains in our infant formula and toddler portfolio.

93.     On January 26, 2022, the Company held its fourth-quarter and year-end 2021

earnings conference call in which Defendants Ford and Funck participated. During the call,

Defendant underscored the significance of the Company's infant formula business:

> In Pediatric Nutrition, US sales growth of more than 10% for the year was led by strong growth of Pedialyte, our oral rehydration brand, and market share gains for Similac, our market leading infant formula brand. During the past year, we continued to expand our Nutrition portfolio with several new product and line extensions including the launch of Similac 360 Total Care in the US and continued global expansion of our PediaSure, Glucerna and Ensure brands with line extensions such as plant-based, lower sugar and high protein products.

94.     The above statements were materially false and misleading and/or omitted

information necessary to make the statements not materially false and misleading. The Individual

Defendants were aware of, but failed to disclose, the existence of manufacturing process and

contamination issues with its infant formula products which were related to infant deaths. In

addition, the violations of applicable health and safety regulations at Abbott's Sturgis facility

caused massive product recalls, exposed the Company to regulatory investigation and censure, as

well as potential class-wide liability in the Securities Action.

95.     In addition, the statements in the Company's February 17, 2022 press release

announcing the recall of Abbott's powdered infant formula, were materially false and

misleading. That press release stated that Abbott was "initiating a proactive, voluntary recall of

powder formulas, including Similac, Alimentum and EleCare manufactured in Sturgis, Mich.,

one of the company's manufacturing facilities." In addition, in the press release, Manning stated:

"We know parents depend on us to provide them with the highest quality nutrition formulas.

We're taking this action so parents know they can trust us to meet our high standards, as well as

theirs. We deeply regret the concern and inconvenience this situation will cause parents,

25

caregivers and health care professionals." The Company failed to disclose, however, that the recall was made at the insistence of the FDA based on information that was known to the Individual Defendants for at least a year.

96. The February 17 press release reported that evidence of Cronobacter contamination was found in "nonproduct contact areas" when, in fact, the FDA that the contamination was found in areas directly contacting infant formula containers and the formula product.

97. In May 25, 2022 testimony before the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, regarding the baby formula shortage, Defendant Calamari stated that Abbott was unaware of the whistleblower's complaints until late April 2022, when the complaint submitted to the FDA was publicly disclosed by a member of Congress:

> Abbott did not find out about it [the whistleblower complaint] until it was made public in the end of April and it was the particular individual who raised the complaint ... it was their choice to use that mechanism to raise the complaint.

98. This statement was materially false and misleading because, as disclosed two weeks later, the whistleblower had filed a similar complaint with OSHA in February 2021. Abbott not only received a copy of the complaint, but the Company filed a nonpublic response to it in April 2021.

99. In the last quarter of 2021, Abbott repurchased an enormous quantity of its own stock in the market (and publicly reporting same to investors as a sign of bullishness) pursuant to a share repurchase program as follows:

100. On December 10, 2021, Abbott's board authorized the repurchase of up to $5 billion of Abbott common shares. Thereafter in January 2022, Abbott purchased 650,000 shares

of its own stock at an average price of 127.26 per share. In February 2022, Abbott repurchased 8,500,000 shares of its own stock at an average price of $123.64 per share. In March 2022, Abbott purchased 8,113,060 shares of its own stock at an average price of $118.34 per share.

## VII.    THE TRUTH IS REVEALED

101.    On February 17, 2022, the FDA publicly announced that it was investigating four consumer complaints of infant illness related to powdered infant formula manufactured by Abbott at the Sturgis facility. The FDA stated that during its an onsite inspection of the facility, it had found Cronobacter contamination in several environmental samples that was linked to infant illness and death. The FDA also disclosed that Abbott's internal records indicated "environmental contamination with Cronobacter and the firm's destruction of product due to the presence of Cronobacter."

102.    On the same day, Abbott issued a recall of certain infant formula products manufactured in Sturgis, including Similac, Alimentum, and EleCare.

103.    On March 22, 2022, after the markets closed, the FDA released reports from three inspections of the Sturgis facility conducted in September 2019, September 2021 and, most recently, between January 31, 2022, and March 18, 2022.  Among other things, the FDA concluded that (a) Abbott failed to establish process controls "designed to ensure that infant formula does not become adulterated due to the presence of microorganisms in the formula or in the processing environment" and (b) Abbott failed to "ensure that all surfaces that contacted infant formula were maintained to protect infant formula from being contaminated by any source."

104.    On April 28, 2022, a redacted copy of a 34-page detailed whistleblower complaint sent to the FDA in October 2021 was made public.  The Complainant was a former employee of

Abbott and his complaint was based on personal knowledge. The whistleblower complaint revealed that Abbott was previously aware of the issues disclosed in February and March 2022. In addition, the complaint alleged that Abbott management at the Sturgis facility had falsified test records; released untested infant formula to the public; continued the use of testing procedures known to be deficient; was unable to trace products in order to properly implement product recalls; and attempted to mislead the FDA during a 2019 inspection audit.

105.    Some of the most egregious violations, allegations, and findings in the Report relevant hereto include, but are not limited to:

### III. INADEQUATE INTERNAL CONTROLS

In countless ways, Abbott has failed to implement and actively enforce adequate internal controls with respect to the Sturgis site. This failure does not appear to be limited to the Sturgis site. Officials at the division level were aware of many of the problems and failed to take corrective measures. Corporate policies and practices were and are clearly inadequate. Indeed, there is evidence that some officials at the division and corporate levels may also be complicit.

**F. *Fraud Against Shareholders.***

But from the standpoint of investors, the implications of the violations are apt to be material in ways that may not be fully appreciated at this point in time. Certainly, the degree to which Abbott has falsely certified its compliance with the cGMPs is apt to heighten the materiality to shareholders.

### 3. Inconsistent and Disparate Treatment

members of management who are intimately involved with circumventing what exist in terms of internal controls are not subject to any discipline other than for failures to meet their metrics. These are individuals who also repeatedly misled officials at the division and corporate level. These are individuals who knowingly direct and approve of actions in direct violation of FDA regulations. A culture of compliance does not exist at the Sturgis site as mandated by the FDA and the Department of Justice's guidance.

### D. HIGHLY QUESTIONABLE INCENTIVE STRUCTURE

It is Complainant's understanding that management at the Sturgis site is rewarded in terms of bonuses of some sort for meeting metrics vis-a-vis other production sites. Productivity is tracked based upon meeting certain data points. Each site provides the information. It was well known to the Complainant and others at the Sturgis site that the information provided to evaluate productivity is frequently and, at times, blatantly false.

## IV. CONCLUSION

Even though Abbott's senior management is now aware of many of the alleged regulatory violations referenced in the foregoing, no serious effort to remedy the violations have been reported to date. Instead, the emphasis appears to be more focused on identifying current employees at the Sturgis site who may have reported concerns to the Complainant. Aside from the mandate of FDA regulations, Abbott's inaction is directly at odds with the mandate of Sarbanes-Oxley mandating adequate internal controls and the Department of Justice's policy mandating effective compliance programs.

Abbott's inaction is also inconsistent with the Corporate Integrity Agreement that it entered into with the Office of Inspector General of the Department of Health and Human Services in May of 2012 as part of a plea agreement. *United States v. Abbott Laboratories,* No. 12-cr-00026 (W.D. Va., filed May 7, 2012). At the same time, Abbott also entered into settlement agreements with various states. Though not directly applicable to Abbott Nutrition, the core concepts apply in terms of the ongoing obligations on the part of Abbott's management and board of directors.

*Id.* at 30-31.

106. On May 16, 2022, the U.S District Court for the Western District of Michigan entered into a consent decree with Abbott.

107. Under the May 16, 2022 consent decree, Abbott agreed to take corrective actions following an FDA inspection of its Sturgis. The consent decree obliges Abbott to take actions that are expected to ultimately result in an increase of infant formula products, while ensuring that the company undertakes certain actions that would ensure safe powdered infant formula is produced at the facility. When the company decides to restart production at this facility, it must conform with the provisions of the proposed consent decree and meet FDA food safety

standards. If contamination is identified, the company must notify the FDA, identify the source of the problem and conduct a root-cause investigation before resuming production.

108. This consent decree also required Abbott to retain an independent expert to review the Sturgis facility's operations to ensure compliance with the law, requirements for testing products, as well as ceasing production, promptly notifying the FDA should contamination be detected, and implementation of a sanitation plan, environmental monitoring plan and employee training programs.

109. On June 8, 2022, it was publicly disclosed that Abbott was aware of the whistleblower's formal allegations no later than early 2021, when a complaint was sent to OSHA and then forwarded to the FDA and Abbott. Investors also learned that Abbott submitted a response to the OSHA complaint two months later.

## VIII.  HARM TO ABBOTT

110. As a direct and proximate result of the Individual Defendants' misconduct, Abbott has sustained millions of dollars in harm. Because of Abbott's violations at the Sturgis facility, Abbott, and others, have been named as defendants in wrongful death actions resulting from Similac contamination: *Restad v. Abbott Laboratories, Inc.,* Case No. 1 :21-cv-00798-A WI-SKO (E.D. Cal.); and from Alimentum contamination: *Diebert v. Abbott Laboratories, Inc.*, Case No. 1 :22-cv-01114-REB (D. Colo.) and the Securities Action. Abbott has had to close Sturgis and to recall products manufactured there. Defendants' actions also caused Abbott to waste hundreds of millions of dollars on repurchasing its own stock through 2021 and the first quarter of 2022.

111. In addition, the Company is not only paying the cost of defending itself in the Securities Action and other actions, but it is exposed to massive potential liability for class-wide

damages, especially in light of the recall. The Company has also incurred costs and expenses in connection with the whistleblower complaint and the regulatory proceedings.

112.    Abbott has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' misconduct and breach of their fiduciary duties.

## IX.    INSIDER SALES BY THE INSIDER SELLING DEFENDANTS

113.    While the Company's outside stockholders lost value, certain insiders did quite well for themselves. In particular, defendants Lane, Capek, Salvadori, Watkin, Wainer, Starks, Ahlberg, Woodgrift, Morrone, Bird, Karam, Pederson and Dale (the "Insider Selling Defendants") sold approximately $130,000,000 worth of their stock collectively during the Relevant Period when Abbott's stock price was at, or close to, its peak and with some sales occurring just a few weeks before the truth was revealed.

114.    While some stock sales may have allegedly been made pursuant to various 10b5-1 plans for the respective Insider Selling Defendants, 10b5-1 plans do not provide a defense or immunity if the plan was adopted while the seller was in possession of material non-public information or made the sale in bad faith as is alleged here.  This is especially true here because 10b5-1 plans typically allow for an insider to sell a minimal amount of pre-determined stock during regular intervals and here these sales appear to be one-off for tens of millions of dollars with no other sales like it in the same time frame preceding the Relevant Period.

115.    Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Abbott's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. The insider Selling

31

Defendants were privy to material, nonpublic information about the Company's true business health.

### A.    <u>Defendant Lane</u>

116.    While in possession of this knowledge, Defendant Lane sold 145,925 shares of his personally held Abbott stock for proceeds of $18,355,279 as reflected in the chart below.

| Trade Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 2021-11-15 | $130.01 | 10,000 | $1,300,090 |
| 2021-08-27 | $125.48 | 135,925 | $17,055,189 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

117.    Lane did not purchase any Abbott stock during the Relevant Period.

118.    While these shares were purportedly sold pursuant to a 10b5-1plan, the Form 4 filed for that sale does not set forth the date of that 10b5-1plan.

### B.    <u>Defendant Capek</u>

119.    While in possession of this knowledge, Defendant Capek sold 149,600 shares of his personally held Abbott stock for proceeds of $20,203,704 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2021-12-13 | $135.05 | 149,600 | $20,203,704 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

120.    While these shares were purportedly sold pursuant to a 10b5-1plan, the Form 4 filed for that sale does not set forth the date of that 10b5-1plan.

121.   Capek did not purchase any Abbott stock during the Relevant Period.

**C.   Defendant Daniel Salvadori**

122.   While in possession of this knowledge, Defendant Salvadori sold 120,214 shares of his personally held Abbott stock for proceeds of $16,471,365 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2022-03-01 | $118.17 | 1,550 | $183,165 |
| 2021-12-23 | $140.00 | 58,501 | $8,190,140 |
| 2021-12-13 | $135.00 | 58,499 | $7,897,365 |
| 2021-03-01 | $120.61 | 1,664 | $200,695 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

123.   While these shares were purportedly sold pursuant to a 10b5-1plan, the Form 4 filed for that sale does not set forth the date of that 10b5-1plan.

124.   Salvadori did not purchase any Abbott stock during the Relevant Period.

**D.   Defendant Watkin**

125.   While in possession of this knowledge, Defendant Watkin sold 97,005 shares of his personally held Abbott stock for proceeds of $11,507,499 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2022-03-01 | $118.10 | -1,038 | $122,589 |
| 2021-04-30 | $119.90 | -94,576 | $11,339,739 |
| 2021-03-01 | $120.61 | -1,391 | $167,769 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33

126.     Per the Form 4 filed with the SEC in connection with the April 30, 2021 sale for $11,339,739 worth of Abbott stock, this stock sale was not made pursuant to a previously adopted 10b5-1plan.

127.     Watkin did not purchase any Abbott stock during the Relevant Period.

**E.     Defendant Wainer**

128.     While in possession of this knowledge, Defendant Wainer sold 86,243 shares of her personally held Abbott stock for proceeds of $11,361,423 as reflected in the chart below.

| Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|
| 2022-03-01 | $118.13 | -456 | 62,172 | -1% | -$53,866 |
| 2021-12-23 | $140.47 | -16,000 | 49,782 | -24% | -$2,247,500 |
| 2021-12-17 | $137.54 | -7,500 | 49,782 | -13% | -$1,031,550 |
| 2021-12-13 | $135.00 | -14,500 | 49,782 | -23% | -$1,957,500 |
| 2021-12-06 | $132.50 | -4,500 | 49,782 | -8% | -$596,250 |
| 2021-11-15 | $130.01 | -12,500 | 49,782 | -20% | -$1,625,111 |
| 2021-09-02 | $127.50 | -9,500 | 49,782 | -16% | -$1,211,250 |
| 2021-08-17 | $125.00 | -14,500 | 49,782 | -23% | -$1,812,500 |
| 2021-03-03 | $121.79 | -6,200 | 51,550 | -11% | -$755,098 |
| 2021-03-01 | $120.61 | -587 | 57,750 | -1% | -$70,798 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

129.     Wainer did not purchase any Abbott stock during the Relevant Period.

**F.     Defendant Starks**

34

130.    While in possession of this knowledge, Defendant Starks sold 50,000 shares of his personally held Abbott stock for proceeds of $5,661,048 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2022-05-03 | $113.22 | 50,000 | $5,661,048 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

131.    Starks did not purchase any Abbott stock during the Relevant Period.

**G.    Defendant Ahlberg**

132.    While in possession of this knowledge, Defendant Ahlberg sold 27,624 shares of his personally held Abbott stock for proceeds of $3,568,219 as reflected in the chart below.

| Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|
| 2022-03-01 | $118.15 | -1,099 | 44,099 | -2% | -$129,847 |
| 2021-11-15 | $130.00 | -25,473 | 36,033 | -41% | -$3,311,490 |
| 2021-03-01 | $120.61 | -1,052 | 24,712 | -4% | -$126,882 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

133.    Ahlberg did not purchase any Abbott stock during the Relevant Period.

**H.    Defendant Woodgrift**

134.    While in possession of this knowledge, Defendant Woodgrift sold 32,348 shares of his personally held Abbott stock for proceeds of $3,769,819 as reflected in the chart below.

| Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|
| 2022-05-04 | $113.00 | -24,000 | 51,177 | -32% | -$2,712,103 |

| Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|
| 2022-03-01 | $118.10 | -964 | 52,498 | -2% | -$113,849 |
| 2021-09-03 | $129.00 | -6,350 | 46,960 | -12% | -$819,150 |
| 2021-03-01 | $120.61 | -1,034 | 53,548 | -2% | -$124,711 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

135. Woodgrift did not purchase any Abbott stock during the Relevant Period.

**I.**      **Defendant Morrone**

136. While in possession of this knowledge, Defendant Morrone sold 30,621 shares of his personally held Abbott stock for proceeds of $4,098,339 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2022-03-01 | $118.16 | 656 | $77,513 |
| 2021-12-17 | $137.54 | 9,988 | $1,373,750 |
| 2021-12-06 | $132.51 | 19,977 | $2,647,076 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

137. Morrone did not purchase any Abbott stock during the Relevant Period.

**J.**      **Defendant Bird**

138. While in possession of this knowledge, Defendant Bird sold 10,552 shares of his personally held Abbott stock for proceeds of $1,151,558 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2021-04-27 | $122.00 | 9,439 | $1,151,558 |

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2021-03-01 | $120.61 | 1,113 | $134,23 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

139.    Bird did not purchase any Abbott stock during the Relevant Period.

**K.    Defendant Karam**

140.    While in possession of this knowledge, Defendant Karam sold 28,700 shares of his personally held Abbott stock for proceeds of $3,687,223 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2021-12-23 | $140.01 | 4,700 | $658,023 |
| 2021-08-17 | $125.00 | 8,000 | $1,000,000 |
| 2021-08-03 | $122.50 | 8,000 | $980,000 |
| 2021-04-27 | $122.00 | 8,600 | $1,049,200 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

141.    Karam did not purchase any Abbott stock during the Relevant Period.

**L.    Defendant Pederson**

142.    While in possession of this knowledge, Defendant Pederson sold 23,008 shares of his personally held Abbott stock for proceeds of $2,969,173 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2021-09-08 | $129.05 | 23,008 | $2,969,173 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

143.    Peterson did not purchase any Abbott stock during the Relevant Period.

**M.    <u>Defendant Dale</u>**

144.    While in possession of this knowledge, Defendant Karam sold 24,128 shares of his personally held Abbott stock for proceeds of $2,888,195 as reflected in the chart below.

| Trade Date | Price | Qty | Value |
|---|---|---|---|
| 2022-03-08 | $117.00 | 4,000 | $468,001 |
| 2022-03-01 | $118.15 | 1,053 | $124,412 |
| 2021-07-28 | $120.33 | 17,600 | $2,117,882 |
| 2021-03-01 | $120.61 | 1,475 | $177,900 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

145.    Dale did not purchase any Abbott stock during the Relevant Period.

**N.    <u>Defendant Boudreau</u>**

146.    While in possession of this knowledge, Defendant Boudreau sold 8,000 shares of his personally held Abbott stock for proceeds of $1,011,920 as reflected in the chart below.

| Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|
| 2021-10-25 | $126.49 | -8,000 | 17,214 | -32% | $1,011,920 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

147.     Boudreau did not purchase any Abbott stock during the Relevant Period.

**O.     Defendant Allen**

148.     While in possession of this knowledge, Defendant Allen sold 204,843 shares of his personally held Abbott stock for proceeds of $25,284,600 as reflected in the chart below.

| Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|
| 2022-03-01 | $118.17 | -1,450 | 167,095 | -1% | $171,348 |
| 2021-02-01 | $123.47 | -203,393 | 151,896 | -57% | $25,113,252 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

149.     Allen did not purchase any Abbott stock during the relevant period.

**P.     Defendant Scoggins**

150.     While in possession of this knowledge, Defendant Scoggins sold 45,000 shares of his personally held Abbott stock for proceeds of $5,545,800 as reflected in the chart below.

| Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|
| 2021-02-01 | $123.24 | -45,000 | 39,706 | -53% | $5,545,800 |

His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

151.     Scoggins did not purchase any Abbott stock during the relevant period.

## X.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

152.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

153.    Abbott is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

154.    Plaintiff is a current shareholder of Abbott and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

155.    Under the circumstances described herein, demand is excused as futile under 805 Ill. Comp. Stat. 5/780.

156.    Seven of Abbott's 13 current directors were on Abbott's board during the five year CIA probation period and were thus aware of the need to maintain and cultivate effective reporting to the Board and yet failed to do so.

157.    In spite of Abbott's stated commitment to safety, and notwithstanding that serious injury or death could result—and had resulted—the Board completely abdicated its duty to oversee the safety of those products and the members of its community.

158.    Abbott is required to comply with regulations and establish controls to monitor and manage sanitation, health hazards and contamination. Abbott, however, did not implement or prioritize sanitation, health hazards and contamination at the requisite level of the corporate pyramid.

159. The Board utterly failed to implement any reporting, internal controls, or information systems regarding sanitation, health hazards and contamination.

160. A pre-suit demand on the Board of Abbott is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company, all of which is independently verified and documented in the whistleblower complaint, and to the present, the Board consisted of Defendants Ford, Alpern, Blount, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Starks, Stratton, and Tilton.

161. Defendants Ford, Alpern, Blount, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Starks, Stratton, and Tilton were also on the board at the time of the CIA.

162. Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are incapable of making an independent and/or disinterested decision to initiate and vigorously pursue this action given the significant problem of Director Defendants' own individual unexculpated personal liability to Abbott.

163. The Individual Defendants either knew or should have known that of the health and safety issues at the Sturgis facility, the danger posed by the contaminated infant formula, and the false and misleading statements were material, paramount to the Company's stock price and issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

164. Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

## COUNT I

**AGAINST DIRECTOR DEFENDANTS FOR CONTRIBUTION
UNDER 15 U.S.C. § 77 K(F) AND 21D(5)(A)-(D)
FOR VIOLATIONS OF SECTIONS 10(B) AND 21D OF THE EXCHANGE ACT**

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    Plaintiff asserts this Count against the Director Defendants (the "Contribution Defendants") who are or will be named in the future as defendants in related securities class actions. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

167.    The Company is named as a Defendant in related securities class actions that allege acts and conduct which constitute violations of Section 10b5 of the Securities Exchange Act and Section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. These suits have caused the Company to incur substantial costs for defense and settlement. If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from the Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

168.    As directors, Defendants had the power to ability to, and did, control over influence, either directly or indirectly, the Company's general affairs, including the content of its

42

public statements, and has the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

169.    The Defendants are liable under Section 77K(f) of the Securities Act and/or section 21D of the Exchange Act, which provides for claims of contributions from the same Defendants named herein.

170.    The Defendants have damaged the Company and are liable to the Company for contribution and/or indemnification. No adequate remedy at law exists for Plaintiff.

## COUNT II

### DERIVATIVELY ON BEHALF OF ABBOTT AGAINST THE THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

171.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172.    By virtue of their positions as officers or directors, the insider selling defendants owned fiduciary duties of loyalty and good faith to the company.

173.    At the time the insider selling defendants initiated their sales of Abbott stock, they knew the Sturgis facility had substantial defects, violations, and would close or was at risk of being closed. The insider selling defendants knew these conditions, and the likelihood of having to shutter the Sturgis facility, thereby severely undercutting potential revenue, were in direct conflict with the bullishness expressed to the market weeks and months earlier.

174.    The insider selling defendants also knew that this was information that the market would consider material and that the announcement of the contaminated formula was virtually certain to harm the Company's stock price. Despite being in possession of this material

nonpublic information, the insider selling defendants sold substantial Abbott stock during the Relevant Period, in violation of their fiduciary duties.

175.    By disposing of their stock while in possession of adverse, material nonpublic information, the insider selling defendants exploited their position at Abbott, and breached their fiduciary duties to Abbott.  Because the insider selling defendants sold their stock before the non-public information in their possession could be fully disclosed to the public and harm the Company's stock price, the insider selling defendants improperly benefited from this breach of fiduciary duty.

176.    Plaintiff, on behalf of Abbott, has no adequate remedy at law.

## COUNT III

## AGAINST THE DIRECTOR DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

177.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178.    The Individual Defendants owed and owe Abbott fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Abbott the highest obligation of loyalty and good faith.

179.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendant  breached their fiduciary duties of loyalty and good faith by failing to adequately remediate the contamination issues at the Company's Sturgis facility; failing to maintain internal controls adequate to enable Abbott to identify and effectively recall contaminated products; permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders; allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures;

44

and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180. The Individual Defendants violated and breached their fiduciary duties by engaging in the acts and omissions herein as well as by trading on material adverse non-public information for the purpose of garnering profits and avoiding losses or failing to take action against those who traded on material adverse non-public information.

181. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Abbott has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

182. Plaintiff, on behalf of Abbott, has no adequate remedy at law.

### COUNT IV

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF § 10(B) OF THE EXCHANGE ACT, 15 U.S.C. § 78(J), AND RULE 10B-5, 17 C.F.R. §240.L0B-5

183. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184. The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

185. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

45

186.     The Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with their purchases of Abbott common stock.

187.     The Individual Defendants acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of Abbott were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

188.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Abbott, their control over, and/or receipt and/or modification of Abbott's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Abbott, participated in the fraudulent scheme alleged herein.

189.     As a result of the foregoing, the market price of Abbott common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the statements, stockholders, including Plaintiff, relied on the statements described above and/or the integrity of the market price of Abbott common stock in purchasing Abbott common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

190.     In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Abbott, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Abbott;

C.     Determining and awarding to Abbott the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.     Directing Abbott and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Abbott to nominate at least two candidates for election to the Board; and

3. a proposal to update the board election process;

4. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 18, 2023

*/s/ Edward A. Wallace*
Edward A. Wallace
Mark R. Miller
**WALLACE MILLER**
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606
T. (312) 261-6193
E. eaw@wallacemiller.com
    mrm@wallacemiller.com

*Liaison Counsel for Plaintiff*

Lee Squitieri
**SQUITIERI & FEARON, LLP**
305 Broadway, 7th Floor
New York, New York 10007
(212) 421-6492

Fletcher Moore
Justin Kuehn
**MOORE KUEHN, PLLC**
30 Wall Street, 8th Floor
New York, New York 10005
(212) 709-8245

*Counsel for Plaintiff*

48